IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 7, 2026 Session

## IN RE LIAM M.

**Appeal from the Circuit Court for Montgomery County**
**No. CC-2023-CV-1886      Kathryn Wall Olita, Judge**

_____

### No. M2024-01437-COA-R3-PT

_____

The circuit court determined that two grounds for termination of a mother's parental rights to her child had been proven by clear and convincing evidence but concluded that the petitioners failed to prove by clear and convincing evidence that termination of the mother's parental rights was in the child's best interest. The petitioners appealed. Discerning no error, we affirm the circuit court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

Mark R. Olson, Clarksville, Tennessee, for the appellants, Jessica B. and Zachary B.

Daniel Ufford, Clarksville, Tennessee, for the appellee, Mikayla M.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves a petition to terminate a mother's parental rights. Mikayla S. ("Mother") and Christian M. ("Father") are the biological parents of Liam M. (born in 2019). Mother experienced a difficult childhood that involved being the victim of a sexual assault perpetrated by one of her mother's friends. Ultimately, this trauma resulted in Mother turning to drugs when she was approximately sixteen years old. After overdosing on marijuana laced with fentanyl in 2018, Mother was presented with the option of joining the military. She accepted that offer and joined the United States Army when she turned eighteen. Unfortunately, shortly after joining the military, Mother was again the victim of a sexual assault.

Shortly thereafter, Mother met Father in March 2019, and they were married three months later. She was eighteen years old when she married Father and was nineteen years old when the child was born. Mother believed that Father was using drugs during the early months of their marriage, but she resisted any invitation from him to do the same. According to Mother, she did not use any drugs during her pregnancy and maintained her sobriety until May or June 2020, when she accepted Father's offer of what she believed to be MDMA. By September 2020, Mother and Father were using drugs daily, with the child being in the home with them approximately fifty percent of the time. Father claimed that, during this time period, he would "drop" drugs into Mother's mouth while she held the child. When the child was not in the parents' home, he often stayed with his paternal grandmother, Jessica B. ("Grandmother"), and paternal step-grandfather, Zachary B. ("Grandfather") (collectively, "the Petitioners").

As Mother's and Father's drug use escalated, they stopped cleaning the home and could not properly care for the child. When the child was six to eight months old, Mother and Father switched him to regular food "like chicken, green beans, and potatoes," foods he could not easily eat, because they could not afford formula. The child became malnourished as a result of this change in diet. Father began taking pictures of Mother and selling them online to earn money for drugs. He also began to prostitute Mother to his friends on a weekly basis for drug money. Both parents admitted that the child was sometimes in the home when Father prostituted Mother to his friends.

In addition to the substance abuse issues, there was domestic violence in the home. Father denied ever striking Mother "closed handed," but video evidence showed that he was very violent with Mother and inflicted physical injury on her by violently hitting her and tossing her into the child's crib. He was ultimately convicted of domestic abuse of Mother in 2021.

The dire situation in the home reached its peak in late November or early December 2019 when Investigator Adam Libertore of the Montgomery County Sheriff's Office received tips from the National Center for Missing and Exploited Children that Father was linked to unlawful child sex abuse material. Investigator Libertore testified that he used the internet protocol ("IP") address assigned to one of Father's electronic devices to locate Father and then executed a search warrant on the parents' home during the overnight hours between December 15 and 16, 2020. When the police executed the search warrant, they found the home in a wretched condition. An excessive amount of garbage and food items were strewn throughout the garage and first floor of the two-story apartment. There was extreme filth in the bathroom, including in the toilet and bathtub, and there were rodent droppings in the child's crib. The child was with the Petitioners when the police executed the search warrant for the parents' home.

When Investigator Libertore searched the parents' cell phones, he found a large amount of pornography, including fifteen images of child sex abuse material. Father had

sent three of the images directly to Mother and had uploaded the other twelve to the parents' linked Google accounts. Father denied possessing the child sex abuse materials and claimed that the parents' roommate, "Ace," was to blame for them. Mother similarly denied any wrongdoing, but she admitted to watching pornography because Father introduced it into their relationship.

Investigator Libertore testified that, when he searched the parents' text messages, he found that Father had sent Mother a GIF[1] that contained child sex abuse material and that Mother had deleted it. Investigator Libertore also found that the parents' text messages to each other contained very graphic conversations that were initiated by Father, including the following:

- Father sent Mother a message stating that they could adopt a child and "f*** it."
- Father sent Mother a message stating that sex with "[d]rugged up sluts either roofied or with molly [is] the most fun."
- Father sent Mother a message stating that, if his mother were "ever brain dead or just gets dementia," he would have sex with her.

Investigator Libertore described Mother's participation in many of these conversations as "reluctant," but she sometimes responded with heart emojis.

Ultimately, Father was indicted on twenty-one criminal counts, including aggravated sexual exploitation of a minor. He pled guilty to two counts of aggravated sexual exploitation of a minor and was sentenced to five years in the Tennessee Department of Corrections. Because child sex abuse images were found on Mother's phone, she was charged with fifteen counts of sexual exploitation of a minor and one count of child abuse and neglect that stemmed from the conditions of the parents' home and allowing the child to live in a "state of filth" adversely affecting his health. Mother entered into judicial diversion for a period of three years for the child abuse and neglect charge.

Investigator Libertore went to the Petitioners' home to check on the child after Mother and Father were arrested. According to Investigator Libertore, Grandmother reacted "atypical[ly]" when hearing the news about her son. She told him that Father had been a "trouble-maker as long as [she has] known him" and that "nothing he does surprises [her]." Grandmother also informed Investigator Libertore that the parents' home was "always" in a deplorable condition and that the child "ha[d] lived in those conditions for some time." She claimed that she never reported it because she feared never getting to see the child again. Following the parents' arrests, the Tennessee Department of Children's

---

[1] "GIF" is an acronym for Graphics Interchange Format, which is "a computer file format for the compression and storage of visual digital information." *GIF*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/GIF (last visited May 26, 2026). Investigator Libertore described a GIF as "a moving picture, . . . almost like a video" that "keeps resetting itself."

Services ("DCS" or "the Department") removed the child from their custody and placed him with the Petitioners. An order entered on May 26, 2021, awarded the Petitioners legal custody of the child, and he has remained in their care continually since that time.

After Mother was released from jail, she took immediate action to start remedying the conditions that caused the child's removal. Most importantly, she stopped using drugs. Her judicial diversion program requires that she submit to random drug screens. She has complied with that requirement and has passed every drug screen. To help her maintain her sobriety, Mother started attending therapy and Narcotics Anonymous meetings every week. She also took parenting classes, obtained and maintained consistent employment, obtained and maintained a suitable home, and instituted divorce proceedings against Father.

Initially, the conditions of Mother's bond prohibited her from seeing or contacting the child. The conditions of her release were amended in May 2021 to allow contact with the child and, on June 29, 2021, she obtained an order from the Montgomery County Juvenile Court that allowed her to have supervised therapeutic visits with the child. She attended weekly visitation with the child from August 2021 until early 2022. In March 2022, the DCS family support service worker assigned to the case formally recommended that Mother begin unsupervised visitation with the child and reported that Mother was "engaged, interactive, brings Liam dinner and works with him on learning and improving developmental skills."

Mother filed a motion for unsupervised visitation in the juvenile court, but before that motion could be heard, the Petitioners filed a petition to terminate both parents' parental rights in the Montgomery County Circuit Court on March 3, 2022. As a result, Mother's visitation ceased, but she quickly filed a motion in the circuit court seeking to resume visitation. The circuit court granted that motion, but no visits were scheduled from March 2022 through August 2023. According to Mother, she contacted between seven and ten service providers but was unable to find someone to supervise the visits. The Petitioners voluntarily nonsuited the first termination petition on August 25, 2023, and then filed the current termination petition three days later. Mother again filed a motion seeking visitation with the child, which was granted, and the court ordered that Open Door Pregnancy and Resource Center ("ODPC") provide therapeutic visitation for Mother and the child. Thereafter, Mother regularly attended the scheduled therapeutic visitation.

The circuit court heard the termination petition over six days. At the conclusion of all the proof, the court entered an order finding that the Petitioners established two termination grounds by clear and convincing evidence as to Mother: abandonment by failure to support and severe child abuse. The court concluded, however, that the

- 4 -

Petitioners failed to prove by clear and convincing evidence that termination of Mother's parental rights was in the child's best interest.[2]

The Petitioners timely appealed and present one issue for our review: whether the circuit court erred in determining that termination of Mother's parental rights was not in the child's best interest. Mother presents an additional issue for review: whether she is entitled to an award of attorney's fees on appeal due to the frivolous nature of the Petitioners' appeal.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

---

[2] The circuit court terminated Father's parental rights. He did not appeal.

Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)).

ANALYSIS

I.  Termination grounds[3]

A.  Abandonment by failure to support

The circuit court concluded that the Petitioners proved by clear and convincing evidence the existence of the termination ground found in Tenn. Code Ann. § 36-1-113(g)(1), which states that parental rights may be terminated if a parent abandons his or her child as defined in Tenn. Code Ann. § 36-1-102. This statute defines "abandonment" in several ways. The Petitioners alleged that Mother abandoned the child as defined in

---

[3] The circuit court found that the Petitioners failed to prove the following termination grounds as to Mother: (1) abandonment by failure to visit, (2) abandonment by failure to provide a suitable home, (3) persistence of conditions, and (4) incompetent to adequately provide for the further care and supervision of the child. The Petitioners do not challenge these findings on appeal. Thus, we do not address those grounds. *See In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn. Ct. App. Mar. 8, 2023) (concluding that it is not necessary for this Court to review grounds that were not proven in the trial court or challenged on appeal). Mother similarly does not challenge the two termination grounds that the circuit court found that the Petitioners proved by clear and convincing evidence. Nevertheless, we will address those two grounds because we must follow our Supreme Court's directive to analyze all termination grounds found by the trial court. *See In re Carrington H.*, 483 S.W.3d at 525 ("[T]he Court of Appeals must review the trial court's findings as to each ground for termination.").

Tenn. Code Ann. § 36-1-102(1)(A)(i). When the termination petition was filed on August 28, 2023,[4] that statute provided, in pertinent part, as follows:

> (i)(*a*) If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;
> (*b*) If the child is less than four (4) years of age, for a period of three (3) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians . . . have failed to make reasonable payments toward the support of the child[.]

Because the child was less than four years old when the Petitioners filed the termination petition, the relevant time period is the three consecutive months immediately preceding the filing: May 28, 2023, through August 27, 2023. It is undisputed that Mother made no support payments during the relevant time period. The record shows that, during this time period, Mother worked "40-60 hours bi-weekly" as a certified peer recovery specialist at Recovery Now, earning $14 per hour. She also received a monthly entitlement from Veterans Affairs in the amount of $3,971.78. Mother's bank statements from the relevant time period show the following deposits: $3,986.78 in May 2023; $4,501.29 in June 2023; and $4,546.78 in July 2023. Thus, as the circuit court found, this proof established that Mother failed to pay any support during the relevant time period despite having the ability to do so.

The analysis of this ground does not end here, however, because Tenn. Code Ann. § 36-1-102(1)(I) provides that "the absence of willfulness" is an affirmative defense to abandonment by failure to support. A parent asserting this affirmative defense bears the burden of proving it by a preponderance of the evidence. *Id.* In her answer to the termination petition, Mother asserted that her failure to pay support was not willful because the "Petitioners have blockaded every effort made by Mother" to pay. Specifically, she claimed that the extensive litigation in this case established that the Petitioners had thwarted, "blockaded," and threatened her such that she was unable to pay support.

---

[4] In the termination petition, the Petitioners alleged that a prior version of the statute applied. As the circuit court did, we apply the version of the statute in effect on the date of the filing of the termination petition.

The record shows that Mother paid the Petitioners a child support allotment from her military paycheck until she was discharged from the Army in August 2021. She testified that, in November 2021, she asked the Petitioners if they needed anything and Grandmother responded that they would take it through the courts if they needed anything. A child support petition was filed in January 2022, but it was ultimately dismissed in March 2022 when the Petitioners filed the first termination petition. We agree with the circuit court's finding that "[b]eing involved in litigation with the Petitioners d[id] not present [a] barrier" to her paying support. Mother admitted that she knew the Petitioners' contact information, including their mailing address, throughout the pendency of this case, and she had the ability to send them support payments during the relevant time period. Mother failed to meet her burden of proof for establishing a lack of willfulness. We affirm the circuit court's determination that clear and convincing evidence established this termination ground.

### B. Severe child abuse

The circuit court also found that the Petitioners proved by clear and convincing evidence the termination ground located in Tenn. Code Ann. § 36-1-113(g)(4). When the termination petition was filed, that statute allowed a parent's parental rights to be terminated if "[t]he parent . . . has been found to have committed severe child abuse, as defined in § 37-1-102, . . . by the court hearing the petition to terminate parental rights or the petition for adoption . . . ." *Id.* (Aug. 2023). As relevant here, Tenn. Code Ann. § 37-1-102(b)(27)(A)(i) defined "Severe child abuse" as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death."

Investigator Libertore's testimony combined with photographs and videos admitted into evidence shows that, at the time the child was removed from the parents' custody, the living conditions of the family's home were astoundingly atrocious. For example, the entire first floor and garage of the home appeared to be treated as a dumpster; trash was littered everywhere. The toilet looked like it had not been flushed in quite some time, the bathroom sink contained what appeared to be bloody tampons, and there were rodent feces in the child's crib. Mother was aware of the condition of the home because Investigator Libertore found text messages from Mother to Father stating that she was "tired of living like this" and that it was "embarrassing." Mother testified that, as her drug use escalated, she "lost control" in September of 2020 and did not properly care for the child. She admitted that the home was not safe for the child and that he could have died or suffered serious injury because she used drugs and engaged in prostitution in the home while the child was present. Based on this evidence, we conclude that the circuit court properly found that the Petitioners proved this ground by clear and convincing evidence.

II.    Best Interest

We have concluded that the trial court correctly found that two grounds for termination existed. Therefore, we turn next to whether the court correctly determined that termination of Mother's parental rights was not in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254.

Our state's termination statutes recognize that not all parental misconduct is irredeemable–meaning that there is a possibility that termination of an unfit parent's rights is not always in the child's best interests. *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). At the best interests stage, the focus shifts to the child's best interests, as viewed from the child's perspective, and the child's interests diverge from those of the parents. *In re Audrey S.*, 182 S.W.3d at 877-78. Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When a court is considering whether to terminate a parent's rights, it must consider the non-exclusive list of factors enumerated in Tenn. Code Ann. § 36-1-113(i). *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). "[T]he facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *Id.* at 682. To ensure that every parent receives the individualized consideration to which they are entitled, "the best interests analysis is and must remain a factually intensive undertaking." *Id.* Any single factor may dictate the outcome of the analysis, *In re Audrey S.*, 182 S.W.3d at 878, but courts must always consider all of the factors and all relevant proof. *In re Gabriella D.*, 531 S.W.3d at 682.

The first group of factors we examine relates to the child's social and emotional needs.[5] *See* Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), (D), (E), (H), (I). At the time of trial, the child had been in the exclusive care and custody of the Petitioners for three years and seven months, and he was very attached to them and their grown son who lives with them. *See id.* § 36-1-113(i)(1)(H), (I) (addressing the parental attachments the child has created with others in the absence of the parent and the emotionally significant

---

[5] Because the factors overlap in numerous regards, we group the factors based on themes present within them. *See, e.g.*, *In re Chayson D.*, 720 S.W.3d 123, 144 (Tenn. Ct. App. 2023). Our grouping of these factors together does not diminish the factually intensive nature of the best interest analysis or the individualized consideration of each factor.

relationships the child has with others). During that time, however, the child also had periods of regular visitation with Mother. Various individuals that supervised those visits testified that all of the visits were positive and that the child had maintained a bond with Mother. *See id.* § 36-1-113(i)(1)(E) (addressing whether the parent has regularly visited to cultivate a positive relationship). Laura Gebhardt, a licensed professional counselor, testified as an expert in the field of childhood behavior. She observed several of the visits between Mother and the child and testified that she could "see the bond" that existed between them. Notably, she observed Mother and child saying "I love you" to each other and believed that the child had a biological and emotional attachment to Mother. *See id.* § 36-1-113(i)(1)(D) ("Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment.").

The Petitioners attempted to negate the evidence of a bond between Mother and the child by claiming that the child experiences "regressions" and behavior difficulties after visits with Mother. In particular, the Petitioners testified that the child's behavior problems at daycare escalated after visits with Mother resumed in 2023. As the circuit court noted, however, the daycare's records do not support this contention because the earliest of the produced records show that his behavioral problems had been occurring for at least nine months before visitations with Mother resumed in December 2023. Furthermore, the records do not show any appreciable increase in his behavioral problems after visits with Mother resumed. The court also noted that the evidence established that the child's concerning behavior did not occur during his visits with Mother. Ultimately, because the Petitioners testified that Mother should never again have custodial rights to the child, the circuit court expressly found "their testimony to be less reliable on this issue." The Petitioners point to no evidence contradicting that finding. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002) (stating that a trial court's witness credibility determinations are afforded great weight on appeal and will not be disturbed absent clear and convincing evidence to the contrary).

Ms. Gebhardt opined that placing the child with Mother would have a positive effect on him because he could maintain the continuity of his relationship with Mother. She acknowledged that the child would certainly experience sadness and grief at the loss of the Petitioners, but she emphasized that he would also experience sadness and grief if he lost Mother. According to Ms. Gebhardt, reunification between Mother and the child could be successful "[i]f done in a way that is not just ripping him completely out overnight, I believe that he will be fine. It needs to be done in a process that is good for his mental health, good for Mom's mental health, good for the [Petitioners'] mental health." She explained that the transition could be handled in a way that allows the child to address his feelings of security through therapy. Mother testified that she understands that, if reunification occurred, it "would have a huge impact on [the child]" and would be "a very big life change." She stated that she could handle it and that she wanted the child to still have a relationship with the Petitioners. *See id.* § 36-1-113(i)(1)(A), (B) (addressing "[t]he

effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority," and "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition[s].").

In considering these factors, the circuit court took into account the guardian ad litem's concern about the child's behavioral issues "such that he may not be thriving in his current environment." We share the guardian ad litem's concern. The record includes the child's daycare records, and they show that he received "behavior notes" from school on a regular basis. The assistant director of the daycare testified that some of the child's behaviors were not typical of other children at the daycare and that sometimes he had to be sent home on days when his behavior could not be regulated. His behaviors include cursing (primarily the "F" word), emotional outbursts, and occasional violence towards others. He once told a classmate, "I'll kill you." According to the assistant director of the daycare, the child has become more violent over time. In light of the foregoing evidence, we agree with the circuit court that factors (A), (B), (D), (E), (H), and (I) do not favor termination of Mother's parental rights.

The next two factors we consider relate to the parent's behavior towards the child. *See id.* § 36-1-113(i)(1)(N), (S). Although Mother provided some financial support for the child in early 2021, she acknowledged that she made no more support payments after being discharged from the military in August 2021 despite having the ability to continue making payments. *See id.* § 36-1-113(i)(1)(S) (addressing "[w]hether the parent has consistently provided more than token financial support for the child"). Mother showed neglect towards the child due to the deplorable condition of the home, as well as the presence of drugs, drug use, and prostitution in the home. *See id.* § 36-1-113(i)(1)(N) ("Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult."). These two factors weigh in favor of termination of Mother's parental rights.

The next group of factors considers the efforts the parent has made to improve his or her conduct or situation that led to removal. *See id.* § 36-1-13(i)(1)(J), (K), (M). We agree with the circuit court's finding that Mother's arrest in December 2020 served as a "wake-up call." She immediately went to work remedying the obstacles to regaining custody of the child. *See id.* § 36-1-113(i)(1)(M) (Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest."). She cooperated with DCS, actively participated in the juvenile court and circuit court proceedings, and filed motions seeking visitation in every case involving the care and custody of the child.

By exerting a great deal of effort and energy, Mother managed to do something that is rarely seen in these cases—she demonstrated a lasting adjustment of her circumstances.

*See id.* § 36-1-113(i)(1)(J)[6] ("Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner."). She has maintained her sobriety since December of 2020. She attends Narcotics Anonymous meetings and therapy every week, and she became a certified peer recovery specialist. Mother also complied with the requirements of her judicial diversion program and, if she continued to do so, her probationary period would end with no sentence being imposed. Mother obtained and maintained employment and housing. Photos admitted into evidence show that Mother's home is clean, safe, and appropriate.

The record also shows that Mother took advantage of several services available to her to help her make a lasting change of circumstances. *See id.* § 36-1-113(i)(1)(K) ("Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions."). She testified that she completed a ten-week parenting course through the Army Family Advocacy Program, parenting classes through ODPC, a cognitive behavior class, and a domestic violence survivor's class. Thus, factors (J), (K), and (M) do not favor termination of Mother's parental rights.

The next group of factors is related to the parent's ability to provide care for the child. *See id.* § 36-1-113(i)(1)(C), (O), (P), (Q), (T). Though it is undisputed that Mother failed to properly care for the child as her drug abuse issues spiraled out of control in late 2020, the record shows that she did provide safe and stable care for the child from his birth until he was approximately five months old. *See id.* § 36-1-113(i)(1)(O) (addressing "[w]hether the parent has ever provided safe and stable care for the child or any other child"). Therefore, we conclude that the evidence preponderates against the circuit court's finding that this factor weighed in favor of terminating Mother's parental rights.

However, we agree with the circuit court's finding that Mother demonstrated an understanding of the child's needs as well as an ability and commitment to creating and maintaining a home that meets those needs. *See id.* § 36-1-113(i)(1)(P), (Q) (addressing "[w]hether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive," and "[w]hether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive"). Mother testified that she is "hyperaware" of the

---

[6] The Petitioners contend in their appellate brief that this factor weighs in favor of termination of Mother's parental rights because she is addicted to alcohol. The Petitioners did not prove this allegation at trial. They filed a motion requesting that this Court consider post-judgment facts related to this allegation. On July 15, 2025, we entered an order denying that request.

child's needs and particularly any behavioral issues that may arise. She explained that, through her time in therapy, she is aware of what might cause an outburst or tantrum. Because Mother obtained employment with a steady income, she was able to establish a home of her own where the child has his own room. The record contains evidence showing that the home had food in it and that Mother purchased educational materials, hygiene items, dishes, arts and craft supplies, toys, a night light, books, a chair for reading, a toddler bed, artwork, clothes, jackets, and a Hot Wheels collection for the child. Several of the people who supervised Mother's visits with the child testified about her parenting and described her as attentive and capable. Therefore, although the child was removed from Mother's custody due to her failure to meet his needs, we agree with the circuit court's finding that, by trial,[7] Mother demonstrated that "she now has continuity and stability and the ability to meet the child's basic material, education, housing, and safety needs." *See id.* § 36-1-113 (i)(1)(C) ("Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs.").

Regarding Mother's mental fitness, she testified that she was diagnosed with post-traumatic stress disorder, generalized anxiety disorder, and depression. *See id.* § 36-1-113(i)(1)(T) ("Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child"). She stated that she does not take medications to manage these disorders because she is able to manage them by attending therapy, exercising, and painting. The record contains no evidence that Mother's mental fitness would be detrimental to the child or prevent her from consistently and effectively providing safe care for the child. We agree with the trial court's finding that factors (C), (P), (Q), and (T) do not weigh in favor of termination of Mother's parental rights.

The remaining factors primarily concern Mother's home environment. *See id.* § 36-1-113(i)(1)(F), (G), (R). As previously discussed, the record shows that Mother established a home that was clean, safe, and well-stocked with everything the child may need. *See id.* § 36-1-113(i)(1)(R) (addressing "[w]hether the physical environment of the parent's home is healthy and safe for the child"). The Petitioners entered into evidence a video recording of the child having night terrors when he first came to live with them. They assert that this established that the child is afraid of living in Mother's home. *See id.* § 36-1-113(i)(1)(F) (addressing "[w]hether the child is fearful of living in the parent's home"). We respectfully disagree.

The people who supervised Mother's visits with the child testified that the child did not seem fearful of Mother or anxious about the visits. Rather, they described him as "responsive to mom" and happy to see her. He engaged with her and sought her out during

---

[7] "[T]he trial court is not confined to reviewing events occurring during a specific time period in its best interest analysis." *In re Kylee T.*, No. W2025-01055-COA-R3-PT, 2026 WL 1256695, at *17 (Tenn. Ct. App. May 6, 2026).

visits. Although the proof shows that the child often experienced night terrors when he first came to live with the Petitioners, it also shows that the night terrors became less frequent over time. Furthermore, the Petitioners failed to establish a causal connection between the child's night terrors and his supposedly being afraid of living with Mother. The child was only eleven months old when he came to live with the Petitioners. Thus, as the Petitioners acknowledge in their appellate brief, he may have retained some memories of living with Mother, but it is doubtful that those memories are significant. Without some proof establishing a causal connection, it is equally plausible that the child experienced the night terrors from his experience living in Mother's home or from living in a new home with the Petitioners.

Similarly, the record contains no proof that Mother's new home, or her boyfriend who lives there with her, would "trigger or exacerbate the child's experience of trauma or post-traumatic symptoms." *See id.* § 36-1-113(i)(G) (addressing "[w]hether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms"). We conclude that the evidence does not preponderate against the circuit court's finding that factors (F), (G), and (R) do not favor termination of Mother's parental rights.

In sum, the circumstances precipitating the child's removal from Mother's custody were horrible, but Mother immediately began work on remedying those circumstances and has accomplished a rare feat in parental termination cases—she established that "[n]ot all parental misconduct is irredeemable." *In re Audrey S.*, 182 S.W.3d at 877. The majority of the best interest factors weigh against terminating her parental rights. It is clear that the Petitioners love the child, but we agree with the circuit court's determination that the combined weight of the proven facts does not amount to clear and convincing evidence that termination of Mother's parental rights is the best interest of the child.

We note that our holding here does not mean that Mother immediately regains custody of the child or that she will ever regain custody. It merely means that the Petitioners failed to meet their burden of proof. As our Supreme Court has explained:

> [W]e do not at all condone or excuse the conduct that resulted in the removal of [this child] from Mother's custody. . . . And we certainly do not minimize the genuine concern and affection Foster Parents have for [this child]. Our decision instead results from an objective and comprehensive review of the record to determine whether the facts presented satisfy the constitutionally mandated heightened standard of proof. This heightened standard is designed specifically to reduce the risk of erroneous decisions depriving parents of their precious and fundamental rights to the care and custody of children. In this case, this heightened standard of proof was not satisfied. We recognize that the result in this case is unusual, but this is an unusual case. Too often parents fail to rehabilitate themselves and make the changes needed to avoid

losing their parental rights forever. The proof in this record establishes that Mother has been able to make the necessary adjustments. This is precisely how the system is designed to function.

*In re Gabriella D.*, 531 S.W.3d at 686.

III.   Frivolous appeal

Mother seeks her appellate attorney's fees pursuant to Tenn. Code Ann. § 27-1-122, which states as follows:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

"An appeal is frivolous when it has 'no reasonable chance of success' or is 'so utterly devoid of merit as to justify the imposition of a penalty.'" *Stokes v. Stokes*, No. M2018-00174-COA-R3-CV, 2019 WL 1077263, at *10 (Tenn. Ct. App. Mar. 7, 2019) (quoting *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009)). "Appellate courts have sole discretion to decide whether to award damages for the filing of a frivolous appeal," but the statute should be applied sparingly "to avoid discouraging legitimate appeals." *Id.* We exercise our discretion to respectfully decline to award Mother her attorney's fees related to this appeal.

CONCLUSION

The judgment of the circuit court is affirmed.  Costs of this appeal are assessed against the appellants, Jessica B. and Zachary B., for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE